# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 23-cr-0271(1) (DWF/DLM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Clenest Demon Wells, Jr., | |
| Defendant. | |

On August 30, 2023, Clenest Wells, Jr. was charged by indictment with four criminal offenses: being a Felon in Possession of a Firearm on or about April 6, 2020 (Count 1); being a Felon in Possession of a Firearm on or about May 22, 2022 (Count 2); and being a Felon in Possession of a Firearm, as well as Unlawful Possession of a Machinegun, on or about July 30, 2023 (Counts 3 and 4). (Doc. 5.) The case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

Mr. Wells filed a total of seven motions to suppress evidence or statements. His First Motion to Suppress Evidence and First Motion to Suppress Statements relate to an April 6, 2020 police encounter. (Docs. 29, 33.) His Second and Third Motions to Suppress Evidence, as well as his Second Motion to Suppress Statements, relate to a May 23, 2022 police encounter.[1] (Docs. 30, 31, 34.) Finally, Mr. Wells's Fourth Motion to Suppress

---

[1] Although Count 2 of the Indictment alleges that Mr. Wells possessed a firearm on or about May 22, 2023, the Court understands that it was Mr. Wells's May 23, 2022 police encounter that gives rise to this charge.

Evidence and Third Motion to Suppress Statements relate to a July 30, 2023 police encounter. (Docs. 32, 35.)

The Court held an evidentiary hearing Mr. Wells's motions to suppress evidence on November 29, 2023. (Docs. 40, 45.) Thomas Calhoun-Lopez, Esq., appeared on behalf of the United States of America ("the government"). Ryan Pacyga, Esq., and Maggie Samec, Esq., appeared on behalf of Mr. Wells, who was present at the motions hearing. The briefing on this matter concluded on January 16, 2024. For the reasons stated below, the Court recommends that Mr. Wells's First Motion to Suppress Search and Seizure Evidence (Doc. 29) should be denied and his First Motion to Suppress Statements (Doc. 33) should be granted in part and denied in part; his Second Motion to Suppress Search and Seizure Evidence (Doc. 30) should be denied and his Second Motion to Suppress Statements (Doc. 34) should be denied at moot; his Third Motion to Suppress Search and Seizure Evidence (Doc. 31) should be denied as moot; and his Fourth Motion to Suppress Search and Seizure Evidence (Doc. 32) and his Third Motion to Suppress Statements (Doc. 35) should be denied.

## BACKGROUND

At the motions hearing, the Court heard testimony from Metro Transit Police Sergeant Marcus Johnson, and Minneapolis Police Officers Neal Walsh, Rashad Powell, and Nicholas Wasche. The government offered and the Court received Government Exhibit 1, Dashboard camera video from Sergeant Johnson's squad vehicle; Government Exhibit 2, Body-worn camera ("BWC") video from Officer Walsh; Government Exhibit 3, BWC

video from Minneapolis Police officer Jacob Spies[2]; Government Exhibit 4, an evidence photograph of a firearm; Government Exhibit 5, an evidence photograph of marijuana; Government Exhibit 6, BWC video from Officer Powell; Government Exhibit 7, an audio recording of Officer Wasche's interview with Mr. Wells on July 31, 2023; Government Exhibit 8A, part one of an audio recording of Officer Walsh's interview with Mr. Wells; and Government Exhibit 8B, part two of an audio recording of Officer Walsh's interview with Mr. Wells. (Doc. 42.) Mr. Wells offered and the Court received Defense Exhibit 1, surveillance video from a Metro Transit Bus; Defense Exhibit 2, BWC video from a Minneapolis Police officer involved in Mr. Wells's arrest on July 30, 2023; Defense Exhibit 3, BWC video from Officer Walsh; Defense Exhibit 4, BWC video from Officer Spies; and Defense Exhibit 5, BWC video from Officer Powell. (Doc. 41.) As noted above, Mr. Wells challenges the constitutionality of evidence discovered and statements he made related to three interactions with police: an April 6, 2020 frisk and arrest on a Metro Transit bus; a May 23, 2022 traffic stop and arrest; and a July 30, 2023 arrest. The evidence presented at the motions hearing established the following.

***April 6, 2020 Police Encounter***

On April 6, 2020, Metro Transit Police Sergeant Marcus Johnson was on routine patrol when he received a call from dispatch at approximately 3:00 p.m. about a "20-year-old [B]lack male . . . described as wearing a black and grey winter hat" who "pointed a gun

---

[2] Officer Spies was not called as a witness at the motions hearing. (*See* Doc. 40.)

at a caller" on a Metro Transit bus. (Tr. at 13.[3]) The bus was traveling on Penn Avenue. (*Id.* at 13) Sergeant Johnson located the bus and, with his lights and sirens activated, stopped the bus at "Penn and Lowry." (*Id.* at 14.) Sergeant Johnson and several other law enforcement officers boarded the bus and ordered everyone on the bus to "lift their hands in the air so we could see their hands." (*Id.*) All of the passengers complied with law enforcement's order. (*Id.*) Officers saw no one on the bus who matched the caller's description, so Sergeant Johnson asked dispatch to relay the description again. (*Id.*) Then Sergeant Johnson "noticed that a suspect . . . matched the description[4]" dispatch had given them. (*Id.*)

When law enforcement realized there was a man who matched the description, an officer asked the man, later identified as Mr. Wells, if he had a "gun on him." (*Id.* at 15, 16.) Mr. Wells replied "no" but the officer asked him to stand up and pat searched Mr. Wells. (*Id.* at 15.) Sergeant Johnson testified that the other officer recognized "[t]he grip of a firearm" during the pat search, and "[l]ocated a firearm . . . stuffed in [Mr. Wells's] pants." (*Id.*) The officer put handcuffs on Mr. Wells and removed the firearm. (*Id.* at 16.)

Sergeant Johnson testified that when the other officer removed the firearm from Mr. Wells's pants, Mr. Wells told law enforcement that the firearm did not have a clip in it.

---

[3] For ease of reference, the evidentiary hearing transcript (found at Doc. 45) will be cited as "Tr." followed by the page number associated with the citation.

[4] On cross-examination, Officer Johnson agreed that no law enforcement officer reviewed the bus's surveillance footage to determine whether Mr. Wells had pointed a gun at any passenger. (Tr. at 22.) Officer Johnson also agreed that no law enforcement officer asked any passenger if they had seen a firearm on the bus or if Mr. Wells had threatened anyone on the bus with a gun. (*Id.* at 24.)

(*Id*.) According to Sergeant Johnson, no law enforcement officer had asked Mr. Wells any questions before Mr. Wells made the statement about the firearm's clip. (*Id*. at 16–17.) Once Mr. Wells was in handcuffs, officers placed him in the back seat of Sergeant Johnson's squad vehicle. (*Id*. at 17.) While Mr. Wells was handcuffed in the back seat of the squad vehicle, Sergeant Johnson asked him administrative questions about how to spell his name and his address. (Gov't Ex. 1 at 15:15:40[5]). When Sergeant Johnson asked Mr. Wells for his address, Mr. Wells responded, "I'm homeless, I found the gun in the alley." (*Id*. at 15:15:53–56.)  A moment later, another officer opened the rear door and asked Mr. Wells if he had a permit to carry a firearm and Mr. Wells said he did not. (*Id*. 15:17:51–18:08.) Then Sergeant Johnson asked Mr. Wells "are you currently on probation or parole?" to which Mr. Wells responded "no." (*Id*. at 15:20:37.) Mr. Wells sat quietly in the backseat of the squad vehicle for a few more minutes, then without being asked any questions said, "I just found that m***er f***er in the alley." (*Id*. at 15:22:40.) At approximately 3:30 p.m., Sergeant Johnson opened the backseat door and advised Mr. Wells of his *Miranda*[6] rights and Mr. Wells told the officer he understood his rights. (*Id*. at 15:28:47–48.)

### *May 23-24, 2022 Police Encounter*

In the afternoon of May 23, 2022, Officer Neal Walsh was on patrol in North Minneapolis, when he observed a Pontiac G6 near the 2000 block of James Avenue. (Tr. at 32.) Officer Walsh testified at the motions hearing that the vehicle "was driving at a very

---

[5] Time stamps reference the time in the upper right corner of the video footage.
[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

high rate of speed through a residential neighborhood." (*Id*.) The speed limit in the neighborhood was 25 miles per hour, but Officer Walsh estimated that the vehicle was driving "about 40-to-50 miles an hour." (*Id*. at 33.) Officer Walsh testified that he followed the vehicle, but lost sight of it. (*Id*. at 33–34.) Eventually, Officer Walsh spotted the vehicle "further down the road," so he activated his emergency lights and stopped the vehicle in an alley. (*Id*. at 34.)

Officer Walsh then approached the vehicle on the driver's side. (*Id*.) He testified that as he approached the vehicle, he "could smell marijuana coming from the car." (*Id*.) The driver, whom law enforcement eventually identified as Mr. Wells, had his window partially rolled down. (*Id*. at 35.) Officer Walsh told Mr. Wells why had been pulled over, and Mr. Wells apologized for speeding. (*Id*. at 36.) Mr. Wells provided an identification card to Officer Walsh and told him the vehicle's insurance was in his wife's name. (*Id*.) When Officer Walsh ran Mr. Wells's identification through a law enforcement database, he learned that Mr. Wells's driver's license had been revoked. (*Id*. at 37.) Officer Walsh returned to Mr. Wells's vehicle and asked him to step out. (*Id*.)

Mr. Wells stepped out of his vehicle and asked Officer Walsh to request a superior officer to come to the scene. (*Id*. at 38.) While trying to detain Mr. Wells, Officer Walsh patted him down. (*Id*. at 38.) Officer Walsh testified at the motions hearing that he noticed a "bulge" in the "front crotch area" of Mr. Wells's shorts and he patted down that area. (*Id*. at 39.) Officer Walsh could "not immediately" tell what the bulge was, but "believed it was a bag of narcotics." (*Id.*) As Officer Walsh testified that he "could feel that it was kind of plastically, crinkly feeling with something inside . . . based on [his] training and experience,

6

it was probably some sort of pill." (*Id*. at 39–40.) Officer Walsh reached into Mr. Wells's left pocket and asked Mr. Wells "what's in here?" while prodding and manipulating Mr. Wells's shorts. (Gov't Ex. 3 at 14:21:46–56.)  At that point, Officer Walsh handcuffed Mr. Wells, but did not advise Mr. Wells of his *Miranda* rights. (Gov't Ex. 2 at 14:22:00.) Officer Walsh then asked Mr. Wells "Do you have a bag of pills in your pants?" while reaching his fingers into Mr. Wells's pocket. (Gov't Ex. 3 at 14:22:13–26.) While still handcuffed, Mr. Wells pulled a small bag of pills out of his left shorts pocket and handed the bag to Officer Walsh. (*Id*. at 14:22:33.) Officer Walsh then led Mr. Wells to the back of his squad vehicle. (Gov't Ex. 2 at 14:22:54–23:13.) As he walked, Mr. Wells asked the officers to make sure his wife could pick up the car. (*Id.*)

Officer Walsh looked inside Mr. Wells's vehicle and noticed a firearm tucked between the driver's seat and the center console. (Tr. at 41; Gov't Ex. 2 at 14:24:50.) Officers Walsh and Spies then searched Mr. Wells's vehicle and discovered bags of marijuana in the center console and in a backpack in the backseat (Tr. at 41; Gov't Ex. 2 at 14:28:21.)

The next day, Officer Walsh interviewed Mr. Wells in an interview room at the Hennepin County Jail. (Tr. at 62–63; Gov't Exs. 8A, 8B.)  Officer Walsh read Mr. Wells the *Miranda* advisory. (Gov't Ex. 8A at 00:38.) Mr. Wells told Officer Walsh he understood his rights and volunteered to give Officer Walsh a DNA sample rather than wait for a warrant. (Gov't Exs. 8A at 00:42.)

*July 30-31, 2023 Police Encounter*

In the early morning of July 30, 2023, Officer Rashad Powell was on patrol with his partner. (Tr. at 72.) Around 3:30 a.m., the officers received a call to the area of Hennepin Avenue and Fifth Street in downtown Minneapolis about a man reaching into a bag with a gun. (*Id*. at 72–73.) The man was described as a Black male, with a beard and his hair in a bun, wearing blue jeans, but no shirt. (*Id*. at 79–80.) The officers went to the reported location and observed two men standing near a vehicle with its hood up. (*Id*. at 74.) One of them matched the description dispatch had provided. (*Id*. at 81.) The other man, later identified as Mr. Wells, was wearing a black mask that covered his face, except for his eyes. (*Id*. at 74–75.)

Officer Powell testified that he drew his weapon, and told the men to stop and put their hands up. (*Id*. at 74.) The man who matched dispatch's description complied with Officer Powell's commands. (*Id*.) Mr. Wells began to walk away. (*Id*. at 74–75.) Officer Powell told Mr. Wells to stop, but Mr. Wells kept walking. (*Id*. at 76.) Officer Powell grabbed Mr. Wells and yelled at him to stop. (*Id*. at 76–77.) At the motions hearing, Officer Powell testified that Mr. Wells began to reach for his waistband. (*Id*. at 77.) Officer Powell believed Mr. Wells might have been reaching for a gun and shook him to knock Mr. Wells off balance, causing Mr. Wells to fall to the ground. (*Id*.) Officer Powell arrested Mr. Wells, searched Mr. Wells incident to his arrest, and discovered a firearm on Mr. Wells's person. (*Id*. 77 –78.)

The next day, Officer Wasche went to the Hennepin County Jail and spoke to Mr. Wells through his cell door. (Gov't Ex. 7.) Mr. Wells refused to go with Office Wasche to an interview room. (Tr. at 89.) Officer Wasche introduced himself, and Mr. Wells asserted that his arrest was illegal. (Gov't Ex. 7 at 00:01–04.) After this exchange, Mr. Wells asked, "Now what else do you want?" and asked that his foodpass be opened so he could hear Officer Wasche better. (*Id.* at 01:33.) Officer Wasche reiterated who he was and why he was there, and Mr. Wells again insisted that his arrest was illegal. (*Id.* at 01:58–02:02:19.) Mr. Wells continued to talk and eventually Officer Wasche interrupted him to provide Mr. Wells a *Miranda* advisory, which Mr. Wells said he understood. (*Id.* at 04:31–35.)

## ANALYSIS

**I.    Mr. Wells's First Motion to Supress Search and Seizure Evidence should be denied and his First Motion to Suppress Statements should be granted in part and denied in part.**

Mr. Wells's First Motion to Suppress Search and Seizure Evidence, as well as his First Motion to Suppress Statements, relate to his encounters with law enforcement on April 6, 2020. In his motion to suppress evidence, Mr. Wells asserts that law enforcement should not have stopped him in the first place because although he was riding on the same bus where a person allegedly was pointing a firearm at other passengers, he did not match the description of the suspect closely enough to establish reasonable suspicion to stop him. Mr. Wells contends that if law enforcement had reviewed the bus's surveillance video, they would have seen "[a]t least three other young black male bus riders [wearing] hats that better fit" the suspect's description. (*Id.* at 17.) The government counters that Mr. Wells fit

the suspect's description closely enough, even if not a perfect match, and was in close enough proximity to the crime scene to support law enforcement's brief investigatory stop of Mr. Wells.

In his motion to suppress statements related to this encounter, Mr. Wells maintains his "custodial statements made in response to questions between the arrest and the *Miranda* warning are inadmissible." (*Id*. at 18.) The government responds that Mr. Wells's statements were spontaneous and not made in response to interrogation or its equivalent, rendering *Miranda* inapplicable.

### A.    Law enforcement had reasonable suspicion to conduct a pat frisk of Mr. Wells.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. It "prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest." *United States v. Childers*, No. 20-cr-211 (PAM/ECW), 2021 WL 5890662, at *4 (D. Minn. Sept. 27, 2021), *R. and R. adopted*, 2021 WL 5505440 (D. Minn. Nov. 24, 2021), *aff'd*, 73 F. 4th 960 (8th Cir. 2023) (quoting *United States v. Arvizu¸* 534 U.S. 266, 273 (2002)). Consistent with the Fourth Amendment, an officer may "conduct a brief, investigatory stop, when [she] has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

While reasonable suspicion requires less proof of wrongdoing than probable cause, *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (citing *Navarette v. California*,

572 U.S. 393, 397 (2014)), officers must have more than an inchoate hunch. *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (citing *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)). The government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *Childers,* 2021 WL 5890662, at *4 (citing *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995)). "The standard takes into account the totality of the circumstances—the whole picture." *Navarette*, 572 U.S. at 397 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)) (internal quotations omitted).

The Eighth Circuit has held that "generic suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description." *United States v. Stokes,* 62 F.4th 1104, 1108 (8th Cir. 2023) (quoting *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016)). Moreover, law enforcement "need not know for certain that [a] suspect is armed; instead, a search is permitted if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015).

Here, dispatch reported to responding officers that a "20-year-old [B]lack male . . . described as wearing a black and grey winter hat" had "pointed a gun at a caller" on a Metro Transit bus. When law enforcement stopped and boarded the bus, they saw no one

exactly matching that description and asked dispatch to relay the description of the suspect again. That is when law enforcement noticed Mr. Wells, a Black man, wearing a grey winter hat. Although Mr. Wells may not have matched every aspect of the dispatched description precisely, he matched closely enough given the short passage of time and the very closed universe of potential suspects—a bus on its route. Mr. Wells argues that law enforcement should have checked the bus's surveillance camera for other suspects before stopping Mr. Wells. But law enforcement need not be "certain that a suspect [is] armed[]" to conduct a brief investigatory stop, "[r]ather a pat-down is permissible if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Horton,* 611 F.3d 936, 941 (8th Cir. 2010) (quoting *Terry,* 392 U.S. at 27 (cleaned up).) That is particularly true under circumstances such as these, where law enforcement is responding to a call involving a firearm being brandished in a dangerous manner. While conspicuous firearm possession itself may not give rise to reasonable suspicion, violent or erratic behavior such as brandishing or pointing a firearm at another person does. Under these circumstances, the Court concludes that law enforcement had reasonable suspicion to conduct a *Terry* pat-down search of Mr. Wells.

**B.    Mr. Wells's spontaneous statements to law enforcement should be admitted, but Mr. Wells's un-Mirandized response to law enforcement's question regarding his permit to carry a firearm should be suppressed.**

Mr. Wells next argues that his "custodial statements made in response to questions between the arrest and the *Miranda* warning are inadmissible." (Doc. 47 at 18.) He seeks to suppress "all statements, admissions, and answers . . . but not limited to the unwarned, custodial statements [he made] during [the] police encounter on April 6, 2020." (Doc. 33.)

The government contends that Mr. Wells's pre-*Miranda* statements were spontaneous and voluntary, not the result of interrogation or its equivalent, and therefore admissible.

*Miranda's* "protections are triggered only when a [person] is both in custody and being interrogated." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (citing *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir. 1992)). "Interrogation is express questioning, or words or actions that the police should know are reasonably likely to elicit an incriminating response." *Id*. (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)) (internal quotations marks omitted). Mr. Wells was in custody when he made statements to law enforcement, "but not all statements made while in custody are products of interrogation." *Id*. at 262 (citing *Innis*, 446 U.S. at 299) (further citations omitted). Indeed, courts have repeatedly held that "a voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of *Miranda* warnings." *Id.* (quoting *Innis*, 446 U.S. at 299) (cleaned up) (further citations omitted.)

Mr. Wells was arrested when law enforcement officers discovered a firearm in his pants during a pat-down search. While he was being arrested, Mr. Wells told law enforcement that the firearm did not have a clip in it. At the motions hearing, Sergeant Johnson testified that Mr. Wells made this statement spontaneously, without being asked any questions by any law enforcement officer. While there is no recording of this statement in the record, the Court credits Sergeant Johnson's testimony based on its observations during the hearing and the fact that it is consistent with other record evidence—Mr. Wells's many other spontaneous statements to law enforcement that were recorded.

13

Once Mr. Wells was in the back seat of Sergeant Johnson's squad vehicle, the vehicle's dashboard camera recorded Mr. Wells's interactions with law enforcement. The video recording makes clear that Mr. Wells made statements both spontaneously and in response to law enforcement interrogation. Mr. Wells made two spontaneous statements that should be admitted. First, in response to Sergeant Johnson asking for Mr. Wells's address, Mr. Wells responded, "I'm homeless, I found the gun in the alley" (Gov't Ex. 1 at 15:15:53.) Although Mr. Wells's answer that he was homeless was induced by Sergeant Johnson's question, Mr. Wells's follow up statement that he found the gun in the alley was not related to any questions posed by Sergeant Johnson. Nor could Sergeant Johnson have expected that his question about Mr. Wells's address would elicit a response about where Mr. Wells found the firearm. Likewise, a few minutes later without any law enforcement inducement, Mr. Wells stated, "I just found that m***er f***er in the alley" (*Id*. at 15:22:40). It is clear from the dash camera footage that Mr. Wells did not make this statement in response to any interrogation (or its functional equivalent) by law enforcement. The Court concludes that Mr. Wells made these statements spontaneously and they are therefore admissible.

But this Court's analysis does not end there. Mr. Wells also made one incriminating statement, prior to being advised of his *Miranda* rights, in direct response to a law enforcement interrogation. While Mr. Wells was still in custody—handcuffed and seated in the back of Sergeant Johnson's squad vehicle—a law enforcement officer opened the rear passenger door and asked he if he had a permit to carry a firearm, to which Mr. Wells responded "no." (*Id*. at 15:17:51–15:18:08.) The law enforcement officer should have

14

known that this question, whether Mr. Wells was permitted to carry the firearm just discovered on his person, was reasonably likely to elicit an incriminating response. After all, Mr. Wells was arrested based on his possession of a firearm, and the question posed related to whether that possession was lawful. The Court concludes that this amounted to interrogation in violation of Mr. Wells's *Miranda* rights, and Mr. Wells's responsive statement should be suppressed.

Thus, the Court recommends that Mr. Wells's First Motion to Suppress Statements (Doc. 33) should be granted in part and denied in part.

## II.    Mr. Wells's Second Motion to Supress Search and Seizure Evidence should be denied.

Mr. Wells's Second Motion to Suppress Search and Seizure Evidence relates to a stop and subsequent search of a vehicle he was driving on May 23, 2022. Mr. Wells argues that law enforcement's warrantless search of his vehicle, the vehicle's center console, and a backpack inside the vehicle were unconstitutional. He asserts that law enforcement did not have probable cause to conduct a warrantless search of the vehicle under the automobile exception. The government responds that law enforcement had probable cause to search Mr. Wells's vehicle without a warrant based on the smell of marijuana emanating from the vehicle.

## A.    Law enforcement had probable cause to stop Mr. Wells's vehicle based on an observed traffic violation.

Although Mr. Wells does not contest the constitutionality of the initial traffic stop, for the sake of completeness, the Court examines the issue. A traffic stop is a seizure under the Fourth Amendment. *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021) (citing

*United States v. Sanchez*, 572 F.3d 475, 478 (8th Cir. 2009)). In general, law enforcement must have probable cause to believe a traffic violation has occurred to reasonably stop a vehicle. *United States v. Galtney*, No. 19-cv-0332 (MJD/BRT), 2022 WL 16701377, at *2, (D. Minn. Aug. 29, 2022) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)), *R. and R. adopted*, 2022 WL 1654946 (D. Minn. Oct. 31, 2022). Even a minor traffic infraction may provide probable cause to justify a stop. *Galtney*, 2022 WL 16701377, at *2 (citing *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

Here, Officer Walsh testified at the motions hearing that he observed Mr. Wells driving "about 40-to-50 miles an hour" in a 25 miles-per-hour zone. (Tr. at 33.) Therefore, based on his observation of Mr. Wells driving faster than the posted speed limit, Officer Walsh had probable cause to stop Mr. Wells's vehicle.

**B.    Law enforcement had probable cause to search Mr. Wells's vehicle based on the smell of marijuana.**

The Eighth Circuit has made clear that the smell of marijuana coming from a vehicle is enough to establish probable cause to search the vehicle for drugs. *Galtney*, 2022 WL 16701377, at *6 (collecting cases). And, when police smell marijuana in a vehicle during a traffic stop, they have probable cause to search the entire vehicle and containers within the vehicle. *United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) (finding that smell of marijuana, along with officer's credible testimony, is enough to establish probable cause to search a vehicle and its contents). Here, Officer Walsh testified during the motions hearing that he smelled marijuana in Mr. Wells's vehicle and the Court credits that testimony based on its observations during the hearing and the fact that it is consistent with

16

other record evidence. The Court finds therefore that law enforcement officers had probable cause to search the entire vehicle without a warrant. *Galtney*, 2022 WL 16701377, at *6 (citing *United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021) ("And based on the smell of marijuana emanating from the car and the marijuana cigarette found in the passenger's jacket, the officers also had probable cause to search the entire vehicle for drugs and drug paraphernalia.")). Because the Court finds that law enforcement had probable cause to search Mr. Wells's vehicle and its contents based on the smell of marijuana, the Court recommends that Mr. Wells's Second Motion to Supress Search and Seizure Evidence (Doc. 30) should be denied.

III.    **Mr. Wells's Third Motion to Suppress Search and Seizure Evidence and Second Motion to Suppress Statements should both be denied as moot.**

Mr. Wells's Third Motion to Suppress Search and Seizure Evidence and Second Motion to Suppress Statements also relate to evidence gleaned from his May 23, 2022 police encounter. Mr. Wells asserts that law enforcement lacked reasonable suspicion to pat search him during the traffic stop, and thus pills discovered by virtue of that search should be suppressed. The government responds that "[Mr.] Wells is not charged with possessing the pills in his pocket, and the [government] agrees that it will not offer evidence of the pills . . . in its case-in-chief." (Doc. 48 at 14 n.3.) Therefore, it is the government's position "that [Mr.] Wells's motion on this point may be denied as moot." (*Id.*) Based on the government's representation that it does not intend to offer evidence of the pills discovered in Mr. Wells's pocket during the traffic stop, the Court recommends that Mr.

Wells's Third Motion to Suppress Search and Seizure Evidence (Doc. 31) should be denied as moot.

In his Second Motion to Suppress Statements, Mr. Wells argues that his unwarned, custodial statements during the May 23, 2022 traffic stop were made in violation of the Constitution.[7] The government asserts that it "does not intend to offer evidence of . . . [Mr.] Wells's admissions regarding the pills in its case-in-chief. It is therefore the position of the [government] that [Mr.] Wells's motion on this point may be denied as moot." (Doc. 48 at 16 n.4.) Based on the government's representation that it does not intend to offer evidence of Mr. Wells's statements in its case in chief, the Court recommends that Mr. Wells's Second Motion to Suppress Statements (Doc. 34) be denied as moot.

## IV.    Mr. Wells's Fourth Motion to Suppress Search and Seizure Evidence should be denied and his Third Motion to Suppress Statements should be denied.

In his Fourth Motion to Suppress Search and Seizure Evidence, Mr. Wells argues that law enforcement did not have reasonable suspicion to stop and frisk him on the night of July 30, 2023, and therefore, any evidence law enforcement discovered because of the stop should be suppressed. The government counters that law enforcement had reasonable suspicion to conduct a brief investigative stop of Mr. Wells, but even if they lacked reasonable suspicion, Mr. Wells's flight after Officer Powell commanded him to stop provided law enforcement with probable cause to arrest him.

---

[7] Mr. Wells does not contest the admissibility of statements he later made to Officer Walsh at the Hennepin County Jail. (*See* Doc. 47 at 12 ("Officer Walsh visited Mr. Wells in the jail. Gov't Exs. 8A and 8B. Mr. Wells was given the *Miranda* advisory and volunteered to give a DNA sample instead of waiting for a warrant. *Id*."))

In his Third Motion to Suppress Statements, Mr. Wells asserts that Officer Wasche did not *Mirandize* him prior to interrogating Mr. Wells at the Hennepin County jail on July 31, 2023. In the alternative, Mr. Wells argues that even if Officer Wasche had provided Mr. Wells with a *Miranda* advisory, Mr. Wells's waiver was neither knowing nor intelligent. Therefore, according to Mr. Wells, his statements to Officer Wasche should be suppressed. The government responds that Mr. Wells's pre-*Miranda* statements were spontaneous, and not the result of police interrogation or its equivalent. The government also argues that Mr. Wells's *Miranda* waiver was voluntary.

**A.    Law enforcement had probable cause to arrest Mr. Wells based on his attempted flight from Officer Powell.**

The Eighth Circuit has consistently held that a person's "flight or resistance in response to a *Terry* stop or arrest, even an unlawful arrest, can provide an independent basis for an arrest." *United States v. Somerville,* No. 20-cr-153 (PAM/KMM), 2021 WL 3476596, at *8 (D. Minn. May 13, 2021), (collecting cases) *R. and R. adopted*, 2021 WL 2886257 (D. Minn. July 9, 2021), *aff'd sub nom. United States v. Finley,* 56 F.4th 1159 (8th Cir. 2023). For example, in *United States v. Blackmon*, law enforcement approached Mr. Blackmon based on information provided by dispatch about a reported disturbance. 662 F.3d 981, 984 (8th Cir. 2011). As they approached, law enforcement ordered Mr. Blackmon multiple times to get on the ground, but Mr. Blackmon did not respond. *Id*. Eventually, Mr. Blackmon raised his fist as if he were ready to fight officers. *Id.* The court concluded that when Mr. Blackmon raised his fists "a reasonable officer would have had probable cause to arrest Blackmon for resisting arrest under Missouri law." *Id.* at 986.

Likewise, here, Officer Powell approached Mr. Wells and another man based on a report from dispatch about a man reaching "into a bag with a gun." (Tr. at 73.) Officer Powell commanded Mr. Wells multiple times to stop and put his hands up, but Mr. Wells first walked away and then began to run. (*Id*. at 74–77.)  Then Mr. Wells reached for something in his waistband and Officer Powell believed he was reaching for a gun. (*Id*.) Based on Mr. Wells's conduct, law enforcement had probable cause to arrest him for fleeing police under Minn. Stat. § 609.487(6).[8] Since officers were justified in arresting Mr. Wells, seizing a firearm from him during a search incident to arrest was constitutionally permissible. Accordingly, the Court recommends that Mr. Wells's Fourth Motion to Suppress Search and Seizure Evidence (Doc. 32) should be denied.

**B.      Law enforcement provided a valid *Miranda* advisory to Mr. Wells and Mr. Wells knowingly and intelligently waived his right during the July 31, 2023 interrogation at the Hennepin County Jail.**

In his Third Motion to Supress Statements, Mr. Wells asserts that "Officer Wasche did not *Mirandize* Mr. Wells, but even if he had, Mr. Wells could not have knowingly and intelligently waived his *Miranda* rights given his state of mind." (Doc. 47 at 27.) The government contends that Mr. Wells "made his admissions to Officer Wasche pursuant to a valid rights advisement and waiver." (Doc. 48 at 18 (citing Gov't Ex. 7 at 04:35.))

---

[8] **Fleeing, other than vehicle.** Whoever, for the purpose of avoiding arrest, detention, or investigation, or in order to conceal or destroy potential evidence related to the commission of a crime, attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running, hiding, or by any other means except fleeing in a motor vehicle, is guilty of a misdemeanor. Minn. Stat. § 609.487(6).

A statement made by a person in custody in response to police interrogation is inadmissible unless the person is given a *Miranda* warning and he voluntarily, knowingly, and intelligently waives his constitutional rights to counsel and right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). There are "two distinct dimensions" to a *Miranda* waiver: whether the statement was voluntary and whether it was knowing and intelligent. *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A waiver is voluntary if it resulted from "free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. A waiver is knowing and intelligent if it was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*. The Court must look at the "totality of the circumstances surrounding the interrogation" to determine whether a person made an uncoerced choice with the requisite level of comprehension. *Id*.

Mr. Wells made his admissions to Officer Wasche pursuant to a valid *Miranda* advisement and waiver. Although Officer Wasche did not advise Mr. Wells of his *Miranda* rights until approximately four minutes into their exchange, the recording makes clear that Officer Wasche tried to advise Mr. Wells of his rights from the start, but Mr. Wells interrupted him with questions about which agency Officer Wasche worked for, and to protest what he believed was his illegal arrest. (Gov't Ex. 7 at 00:01–1:33.) Mr. Wells then asked, "now what else do you want?" and asked for his foodpass to be open so that he could hear Officer Wasche better. (*Id.* at 1:33–48.) Officer Wasche then told Mr. Wells who he was, why he was there, and asked if anyone had ever read Mr. Wells his *Miranda* rights

before. (*Id*. at 1:58–2:21.) Mr. Wells again complained about his arrest, and explained to Officer Wasche why he wears a ski mask and why he carries a firearm. (*Id*. at 2:21–4:31.) Officer Wasche stopped Mr. Wells and said, "before we go any further, I'm going to advise you of your rights. Okay?" and proceeded to advise Mr. Wells of his right to remain silent, that anything Mr. Wells said can and will be used against him in court, that Mr. Wells had a right to have a lawyer present during questioning, and if Mr. Wells cannot afford a lawyer, one would be appointed to him at no cost. (*Id.* at 4:31–48.) Officer Wasche then asked Mr. Wells if he understood those rights (*Id*. at 4:49) and Mr. Wells responded "of course, why wouldn't I?" (*Id*. at 4:50–51.)

It is clear from the recording of Officer Wasche's interaction with Mr. Wells that Officer Wasche provided Mr. Wells a valid *Miranda* advisory and that Mr. Wells voluntarily, knowingly, and intelligently waived his rights. Mr. Wells does not argue that his waiver was not voluntary, but he asserts that he could not have knowingly or intelligently waived his rights because of his state of mind. The evidence in the record belies this argument. Although Mr. Wells sounds excited and frustrated during his interaction with Officer Wasche, the Court concludes that his answers were coherent and there is no indication in the record that Mr. Wells was under the influence of any controlled substances that would inhibit his decision making during their interaction. Moreover, Officer Wasche asked Mr. Wells if he understood his rights and Mr. Wells exclaimed that of course he did. After Mr. Wells stated that he understood his rights, he proceeded to explain to Officer Wasche that he also knew that "law enforcement can lie to me" (*Id*. at 5:05) but nevertheless continued speaking with Officer Wasche. Based on the totality of

22

these circumstances, the Court concludes that Officer Wasche provided a valid *Miranda* waiver to Mr. Wells and Mr. Wells voluntarily, knowingly, and intelligently waived those rights.

The Court also concludes that Mr. Wells's pre-*Miranda* statements to Officer Wasche about why he wears a ski mask and carries a firearm are admissible. "Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *United States v. Smialek,* No. 18-cr-123 (JNE/BRT), 2018 WL 5067498, at *5 (D. Minn. Aug. 30, 2018) (quoting *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016), *R. & R. adopted*, 2018 WL 5045776 (D. Minn. Oct. 17, 2018), *aff'd,* 970 F.3d 1070 (8th Cir. 2020). "An officer's response to a defendant's question does not amount to interrogation." *Id*. (collecting cases). Mr. Wells made his statements about wearing a ski mask and carrying a firearm after asking Officer Wasche "can you tell me the story that you had [about why Mr. Wells was arrested]?" (Gov't Ex. 7 at 3:20–27.) Officer Wasche recounted what he read in police reports, and Mr. Wells retorted "how can you identify someone with a ski mask on?" and then continued to explain to Officer Wasche why he wears a ski mask and carries a firearm. (*Id*. at 3:27–4:31.) The Court concludes that Officer Wasche's response to Mr. Wells's question does not amount to interrogation, and Mr. Wells's subsequent voluntary statements are admissible.

Therefore Mr. Wells's Third Motion to Suppress Statements (Doc. 35) should be denied.

## RECOMMENDATION

Accordingly, based on all the files, records, and proceedings above, **IT IS RECOMMENDED** that:

1.  Mr. Wells's First Motion to Suppress Search and Seizure Evidence (Doc. 29) should be **DENIED**;

2.  Mr. Wells's First Motion to Suppress Statements (Doc. 33) should be **GRANTED IN PART** and **DENIED IN PART**;

3.  Mr. Wells's Second Motion to Suppress Search and Seizure Evidence (Doc. 30) should be **DENIED**;

4.  Mr. Wells's Second Motion to Suppress Statements (Doc. 34) should be **DENIED AS MOOT**;

5.  Mr. Wells's Third Motion to Suppress Search and Seizure Evidence (Doc. 31) should be **DENIED AS MOOT**;

6.  Mr. Wells's Fourth Motion to Suppress Search and Seizure Evidence (Doc. 32) should be **DENIED**; and

7.  Mr. Wells's Third Motion to Suppress Statements (Doc. 35) should be **DENIED**.

Date: February 15, 2024                    *s/Douglas L. Micko*
                                           DOUGLAS L. MICKO
                                           United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).